**BOARD OF TRADE OF KANSAS CITY, MO., et al. v. UNITED STATES et al. (BOARD OF RAILROAD COM'RS OF NORTH DAKOTA et al., Interveners).**

No. 555.

District Court W. D. Missouri, W. D.

Jan. 21, 1941.

M. W. Borders and Wilfred Wimmell, both of Kansas City, Mo., and Samuel J. Wettrick, of Chicago, Ill., for complainants.

Thurman Arnold, Asst. Atty. Gen., Smith R. Brittingham, Jr., and Elmer B. Collins, Sp. Assts. to Atty. Gen., and Richard K. Phelps, Asst. U. S. Atty., of Kansas City, Mo., for defendant United States.

J. Stanley Payne, Asst. Chief Counsel, Interstate Commerce Commission, and Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, both of Washington, D. C., for defendant Interstate Commerce Commission.

Alvin C. Strutz, Atty. Gen. of North Dakota, and James M. Hanley, of Mandan, N. D., Commerce Counsel of the Board of Railroad Commissioners of State of North Dakota, for interveners Board of Railroad Com'rs of State of North Dakota and others.

J. W. Taylor, Atty. Gen., and D. W. Thomas, Asst. Atty. Gen. of State of Idaho, for interveners Public Utilities Commission of State of Idaho, and Idaho State Grange, Inc.

Ralph W. Currie and Frank A. Leffingwell, both of Dallas, Tex., and V. E. Phillips, of Kansas City, Mo., for interveners Texas Industrial Traffic League, Fort Worth Grain and Cotton Exchange, and Tex-O-Kan Flour Mills Co.

Harrison J. Freebourn, Atty. Gen. of State of Montana, and Emmett C. Angland, of Helena, Mont., Counsel for Board of Railroad Com'rs, for interveners Board of Railroad Com'rs for State of Montana.

Before THOMAS, Circuit Judge, and OTIS and COLLET, District Judges.

COLLET, District Judge.

Action to enjoin the enforcement of an order of the Interstate Commerce Commission affecting railroad grain rates. Plaintiffs are the Board of Trade of Kansas City, Missouri, engaged in the business of buying, selling, processing and handling grain, flour, mill feeds, mixed feeds and other products of grain at that city; certain individuals and corporations engaged in a similar business at Kansas City, Missouri; the Minneapolis Traffic Association and private business interests engaged in a like business at Minneapolis, Minnesota; the Omaha Grain Exchange and private business interests engaged in the same line of endeavor at Omaha, Nebraska; the St. Joseph Grain Exchange and individual business interests engaged in the grain business at St. Joseph, Missouri, and certain individuals interested in a like business at Leavenworth, Kansas, and Atchison, Kansas.

Plaintiffs bring this action for themselves and in behalf of others similarly interested at Kansas City, Missouri, and Kansas City, Kansas; St. Louis, Missouri; Omaha, Nebraska; Minneapolis, Minnesota; St. Joseph, Missouri; Atchison, Kansas, and Leavenworth, Kansas, which centers are known as and will hereafter be referred to as "primary" or "rate-break" markets.

The defendants are the United States of America and the Interstate Commerce Commission. Interested parties intervening as parties defendant with the object of sustaining the order of the Interstate Commerce Commission are the Board of Railroad Commissioners of the State of North Dakota and various North Dakota interests; the Public Utilities Commission of the State of Idaho and the Idaho State Grange, Inc.; the Texas Industrial Traffic League; the Fort Worth Grain and Cotton Exchange and Tex-O-Kan Flour Mills Company, and the Board of Railroad Commissioners of the State of Montana represented by the Attorney General of that State.

As required by the Judicial Code, Title 28 U.S.C.A. §§ 41(28), 43, 45, 46, 47 and 48, a three-judge statutory court was convened and the cause heard on the merits November 11, 1940.

Pursuant to a Joint Resolution of Congress of January 30, 1925, known as the Hoch-Smith Resolution, 43 Stat. 801, 49 U.S.C.A. § 55, the Commission embarked upon a general investigation of the rate structure of common carriers in the Western District therein defined. The Commission found in existence two basic methods for permitting the temporary stopping of grain for milling and other purposes at intermediate points between the point of origin and point of final destination without requiring the payment of the comparatively high local rates for each of the two segments of the transportation. Those two methods are known as the through rate with transit and the proportional rate.

The issues here involved necessitate a clear understanding of these rates.

The through rate with transit, or "transit" as it is frequently referred to, may best be explained in the language of the Commission: "Transit permits of the drawing of grain into the transit point, and of the later outbound shipment of an equivalent tonnage of that kind of grain or its products, on the basis of the 1-factor through rate from the origin of the grain to the final transit destination. The local rate on the inbound shipment to the transit point is first paid, and the freight bill covering that shipment is recorded with the transit bureau, as evidence of intention of further transportation of the inbound grain (or its equivalent in tonnage) or its products. When the outbound shipment is tendered the inbound freight bill is surrendered as authority for the charging on the outbound shipment (in lieu of the local rate from the transit point that would otherwise apply) of the difference between the inbound local rate and the 1-factor through rate (the transit balance) from the origin of the grain to the final destination." 215 I.C.C. 83, loc.cit. 90.

The proportional rate or "rate-break combination" as it is frequently designated is peculiar to the primary or rate-break markets where it alone applies. The rate itself is the average of all transit balances from a primary market to a final destination point. It is the substantial equivalent of the transit balances between each of the primary markets and the various final destination points to which it is made applicable. Grain dealers at the primary markets could, therefore, know in advance of the purchase of grain at its origin exactly what the rate would be from each primary market to the principal final destination points to which the proportional rate applies regardless of what the transit balance of the through rate from the particular point of origin to the final destination might be.

Speaking in general terms, the Commission found that the availability of both methods of transit to the primary markets resulted in undue and unfair discrimination in favor of the primary markets over intermediate interior points not possessing the proportional rates, confusion and unsettlement of grain prices, and undue loss of revenues to the carriers. It concluded that both methods of transit should not be available to any market, and finding that the proportional rate was more advantageous to the primary markets than the through rate with transit, it reduced the proportional rate and ordered the discontinuance of transit privileges under through rates at the primary markets when the reshipment was between a primary market and a final destination point having an established proportional rate. It did not abolish the privilege of transit on through rates when the reshipment was to a point not having a proportional rate. 205 I.C.C. 301. At the time of the original consideration of the rate situation the Commission was of the opinion that it was necessary to eliminate transit privileges on through rates at intermediate interior points other than primary markets when those intermediate points were located upon the line between primary markets and final destination points to which proportional rates applied. That order of the Commission (164 I.C.C. 619) was set aside (on other grounds) as a result of the opinion of the Supreme Court in Atchison, Topeka & Santa Fe Ry. Co. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273. Upon reconsideration of the entire question the Commission reiterated, as above noted (205 I.C.C. 301), its conclusion that both proportional rates and transit on through rates should not be available to the same market. It later, however, revised its conclusion as to the necessity of prohibiting transit on through rates at intermediate interior points, the effect of which had been to deprive those points of any substantial transit privileges, and by subsequent order permitted transit under through rates at all interior intermediate points which did not possess the proportional rates.

On complaint of the primary, or rate-break markets, that the deprivation of transit privileges on through rates at those markets was injurious, the Commission (223 I.C.C. 235) granted permission to the carriers to voluntarily grant transit privileges on through rates at the primary markets for a limited period. The carriers declined upon the general grounds that proportional rates having been decreased at the time the right to the dual system was prohibited at primary markets, the reestablishment of the transit privilege on through rates at primary markets would re-establish the dual system with subsequent loss of revenue which they could not afford. The primary markets then petitioned the Commission for a mandatory

order on the carriers to reinstate the transit privilege on through rates at those points. This the Commission denied and permitted the permissible order to expire on the date theretofore fixed. 229 I.C.C. 9. Thereafter, the plaintiffs herein again petitioned the Commission for modification of its previous order abolishing the dual system and formally requested the re-establishment of transit privileges on through rates. This the Commission denied. 231 I.C.C. 793.

The gravamen of the complaint of plaintiffs in the present action is that the order of the Commission denying the primary markets the privilege of having both the transit privilege under the proportional rate and also under the through rate with transit is unreasonable, unfair, unjust and discriminatory.

The plaintiffs assert that orders of the Interstate Commerce Commission will be set aside (1) if in excess or disregard of its delegated powers; (2) if based in whole or in part upon an erroneous construction or application of the law; (3) if based in whole or in part on consideration of evidence outside of the record; (4) if, although acting within the power of its delegated authority the Commission's action is arbitrary and unreasonable; (5) if not based on evidence or findings based thereon.

Specifically, plaintiffs contend that in the present case:

(1) The findings of the Commission are general and do not find sufficient evidentiary facts upon which the general factual conclusions may be properly based.

(2) The facts found do not authorize the order.

(3) That the order of the Commission is unjust, unreasonable and discriminatory as to the primary markets in violation of the provisions of the Interstate Commerce Act, as amended, 49 U.S.C.A. § 1 et seq. (which sections are quoted below)[1]; and

---

[1] "Section 1. * * * (5) All charges made for any service rendered or to be rendered in the transportation of passengers or property or in the transmission of intelligence by wire or wireless as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful. * * *"

"§ 2. If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property or the transmission of intelligence, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation or transmission of a like kind of traffic or message under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful."

"§ 3. (1) It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, or any particular description of traffic, in any respect whatsoever or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

"§ 15 (1) Whenever, after full hearing, upon a complaint made as provided in section 13 of this chapter, or after full hearing under an order for investigation and hearing made by the commission on its own initiative, either in extension of any pending complaint or without any complaint whatever, the commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this chapter for the transportation of persons or property or for the transmission of messages as defined in the first section of this chapter, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this chapter, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this chapter, the commission is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged (or, in the case of a through route where one of the carriers is a water line, the

is so arbitrary and unjust that it exceeds the Commission's powers and is void.

The Commission's findings in part are:

(1) That the use of transit balances under through rates and the proportional rates out of the same rate-break markets—

(a) tend to disorganize the rate-break combinations, (b) disorganize the general rate structure, (c) make uncertain in advance the outbound basis of charge, (d) give an undue preference to those having the privilege of both transit balance and proportional rates, (e) depress the price of grain at the rate-break markets and by direct reflection at the country points, and (f) reduce the revenue of the carriers.

(2) That the dual system of rates at these markets was an evil requiring a remedy.

(3) That the evils of the dual system cannot be eliminated by abolishing proportional rates on outbound shipments from the primary markets, nor by abolishing transit on through rates generally; nor by adopting a mileage basis for all rates, nor by any known and practical means other than the abolishment of the dual system; and

(4) That prescribed through rates based upon flat (or local) rates to the primary markets and proportional rates beyond will be reasonable and fair to all markets; and that overhead through rates through primary markets less than those combinations should be cancelled.

 The above summarization of the Commission's findings indicates that it found both specific facts and the ultimate fact which necessarily followed therefrom. It is to be borne in mind that plaintiffs do not question the existence of or sufficiency of evidence to support the factual conclusions. On the contrary, they have apparently conceded without argument that there was evidence before the Commission on the subject embraced within the Commission's conclusions. The point is, that the findings are not sufficient in themselves upon which the order could legally be

based. It may well be asserted that the findings of the Commission to the effect that the possession of both the proportional rate and the through rate with transit by the same market is unreasonable and discriminatory is such a conclusion of fact as was condemned in United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023. But the finding of the Commission that the use of transit balances less than proportional rates at the primary rate-break markets tends to disorganize the proportional rates, disorganizes the general rate structures, makes uncertain the basis of charge on outbound shipments, gives a preference (which the Commission concluded was undue) to markets possessing both methods of transit, depresses the price of grain at the primary markets and at country points and reduces the revenues of the carriers, are plain facts from which the Commission concluded a change should be made. The explanation of the Commission's reasons for making the change it did make to correct the factual situation found to exist may be characterized as the Commission's argumentative conclusions but they properly tend to explain the reasoning of the Commission from the evidentiary facts. If evidentiary facts exist to support the Commission's conclusions, we are not here concerned with the correctness of the Commission's reasoning, with the soundness of its conclusions or with any possible inconsistencies with findings made in other proceedings before it. Virginian Ry. Co. v. United States, 272 U.S. 658, 665, 666, 47 S.Ct. 222, 71 L.Ed. 463. Obviously, the Commission found the necessary facts upon which the conclusion it reached was based.

The second question presented is based upon several arguments, all of which when reduced to their final analysis amount to the simple proposition that the evidentiary facts upon which the Commission's conclusion was based are facts which, under the law, may not constitute the foundation for rate regulation or adjustment. Otherwise stated, plaintiffs contend that the

maximum rates, fares, and charges applicable thereto), and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation or transmission other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed."

advantages which they had from the dual methods of transit available to them sprang from the geographical location of the primary markets and other natural conditions existing at those markets, such as large grain storing facilities and numerous rail lines, which plaintiffs assert entitle those markets to the advantages of the dual system. For that reason, plaintiffs insist the Commission's conclusion that the dual system should be abolished was based upon facts which, under the law, could not legally justify the order depriving them of the dual system.

 It must readily be conceded that the Commission may not equalize unequal natural conditions. Texas & Pacific Ry. Co. v. United States, 289 U.S. 627, 53 S.Ct. 768, 77 L.Ed. 1410; Penn Refining Co. v. Western New York & P. R. R. Co., 208 U.S. 208, 28 S.Ct. 268, 52 L.Ed. 456; United States v. Illinois Cent. R. R., 263 U.S. 515, 44 S.Ct. 189, 68 L.Ed. 417; Ellis v. Interstate Commerce Commission, 237 U.S. 434, 35 S.Ct. 645, 59 L.Ed. 1036. Academically speaking, it may not give to a community, the geographical location of which makes it naturally more inaccessible, the same advantages of accessibility to a given point which another community advantageously situated possesses. But the Commission may adjust rates to meet "transportation conditions". That transportation conditions may and should include conditions other than mere operating conditions is apparent from the following cases: Texas & Pacific Ry. Co. v. Interstate Commerce Commission, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940; Ann Arbor Ry. Co. v. United States, 281 U.S. 658, 50 S.Ct. 444, 74 L.Ed. 1098; Interstate Commerce Commission v. Chicago, R. I. & P. Ry. Co., 218 U.S. 88, 30 S.Ct. 651, 54 L.Ed. 946.

 The establishment of proportional rates at the primary markets was to an extent because of their natural location and the convergence and radiation of rail lines thereat and therefrom. The proportional rate was considered peculiarly appropriate to the natural conditions existing at the primary markets. It was intended to secure to those markets all of the advantages of the through rate with transit to which the primary markets were entitled from that rate because of their geographical location and natural advantages and the additional advantages inherent in the proportional rates, which additional advantages sprang from natural and geographical considerations. But when the Commission examined the situation resulting from the use of both the transit on through rates and the proportional rates by the same markets it found that the combining of the use of both resulted in advantages to the primary markets which did not flow from their geographical location but were on the contrary in spite of natural conditions and to the material disadvantage of other markets. That disadvantage may best be explained by a brief illustration. A miller at Independence, Missouri, situated only a short distance from Kansas City, Missouri, purchases grain at its origin at Dodge City, Kansas. He may move that grain to Independence on the local rate from Dodge City to Independence and reship to Chicago for the transit balance of approximately 16 cents. The miller at Kansas City may likewise purchase grain at Dodge City, Kansas, move it to Kansas City on the local rate and reship to Chicago on the proportional rate of 16 cents. If, however, the privilege of utilizing the transit balance on the through rate is available to the miller at Kansas City, Missouri, he may reship from Kansas City to Chicago on the transit balance of the through rate from Omaha to Chicago via Kansas City which is approximately 10 cents, if (as the Commission found was almost always the case) the Kansas City miller had moved a like quantity of grain from Omaha to Kansas City upon the proportional rate of 6½ cents. Thus the Kansas City miller would have a distinct advantage over the Independence miller which the Commission found was not insignificant in practice. Undoubtedly, such a condition must be characterized as a transportation condition which the Commission is authorized to regulate. Even if that were not true, however, the loss of revenue to the railroads resulting from the illustration, the disorganization of the existing[2] proportional rate, and the effect on grain prices are undeniably transportation conditions, which the Commission must legally take cognizance of. It must follow, therefore, that the facts upon which the Commission based its conclusion were not facts which the Commission could not legally consider as a basis of rate regulation.

[2] See Youngstown Sheet & Tube Co. v. United States, 295 U.S. 476, 55 S.Ct. 822, 79 L.Ed. 1553. Compare United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023.

It is further contended by plaintiffs that the result of the deprivation of transit privileges on through rates at the primary markets is so unreasonable and unjust that it may not stand. The argument is based upon the fact that in some instances a grain dealer or miller at a point substantially the same distance or even at a greater distance from final destination may reship to the latter point on the transit balance for less than the proportional rate now alone available to the primary market. An illustration will again best suffice as an explanation. It is possible for a miller at Independence, Missouri, to purchase grain at Omaha, move that grain to Independence, mill it there and reship it to Chicago for the transit balance of the over-all through rate of 16 cents, whereas if the miller at Kansas City purchases grain at Omaha, moves it to Kansas City upon the proportional rate existing between Omaha and Kansas City of 6½ cents and reships to Chicago over the same line which the Independence miller uses, he must in addition pay the proportional rate between Kansas City and Chicago of 16 cents or a total of 22½ cents. Undoubtedly, this situation discloses a discrimination against Kansas City. The same discrimination would apply to other primary markets using other similar illustrations. Fundamentally, the condition depicted may occur because of the existence of an unusual and unnatural through rate between Omaha and Chicago via Kansas City set up by carriers not having a direct route between Omaha and Chicago in order that they may compete with the direct lines in the movement of grain between those points. Obviously, Kansas City shippers are not entitled because of their geographical location to ship grain from Omaha to Kansas City and thence to Chicago at the same rate as grain is carried from Omaha on a direct line to Chicago. If they move grain from the territory comprising their natural trade territory, the proportional rate gives them all and more than the interior points possess with transit on through rates from that area. The question really is whether the availability to interior points of unnatural through rates with transit which are not available to the primary markets is so discriminatory as to render the rate structure unlawful.

Unless the discrimination be undue, unjust, unfair or unreasonable, the Courts may not interfere, United States v. Chicago Heights Trucking Co., 310 U.S.

344, 60 S.Ct. 931, 84 L.Ed. 1243, and the Commission's conclusion that the result of the order is not unjust or unreasonably discriminatory, is binding upon the Court unless the Commission has proceeded upon erroneous legal principles or the order is so patently arbitrary that it may not be sustained on any rational theory. Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147; Interstate Commerce Commission v. Union Pacific, 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308; Manufacturers' Ry. Co. v. United States, 246 U.S. 457, 38 S.Ct. 383, 62 L.Ed. 831. The legality of the considerations actuating the Commission has heretofore been considered, hence we are now concerned only with the question of unreasonableness.

The Commission supported the reasonableness of the discrimination depicted by the illustration by pointing out that it was necessary to avoid unfairness to interior points such as Independence to make available to them one or the other of the two methods of transit. It was impossible to give them the benefit of the broader benefits incident to the proportional rate because those points did not have the geographical or natural advantages entitling them to the proportional rate. It was impossible to devise a practical rate structure which eliminated all possible minor discriminations. Hence, they must be permitted to transit on through rates or none at all. The Commission found that the granting of the privilege of transit on through rates to interior intermediate points was of no substantial injury to the primary markets because of the insignificant opportunity of the interior points to, by the transit privilege under through rates, compete with the primary markets operating under proportional rates. The facts amply support the Commission in that conclusion. It must follow that the limited privilege extended to the interior points incident to their possession of the right to transit on through rates is not such an undue, unjust or unfair discrimination as to be so clear and obvious that it may be characterized as illegal.

It must be assumed that should the interior points in some unforeseen manner be able to utilize their transit privileges in such a manner as to materially equalize or tend to overcome the natural advantages possessed by the primary markets, the

Commission will, upon proper application, adequately meet the situation.

The plaintiffs' bill should be dismissed on the merits.